**NOT FOR PUBLICATION**

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| ANGELA R. ESSEX and GABRIELA MARADIAGA, individually and on Behalf of All Other Persons Similarly Situated,<br><br>*Plaintiffs*,<br><br>v.<br><br>THE CHILDREN'S PLACE, INC.,<br><br>*Defendant*. | Civil Action No. 15-5621<br><br>**OPINION** |

**John Michael Vazquez, U.S.D.J.**

This case is a collective action pursuant to the Fair Labor Standards Act. Currently before the Court is a motion to compel arbitration as to certain opt-in plaintiffs ("Opt-In Plaintiffs") filed by Defendant The Children's Place, Inc. ("TCP" or "Defendant"). D.E. 117. Plaintiffs Angela Essex and Gabriela Maradiaga ("Plaintiffs") filed a brief in opposition, D.E. 124, to which Defendant replied. D.E. 127.[1] The Court reviewed the submissions made in support and in opposition of the motion and considered the motion without oral argument pursuant to Fed. R. Civ. P. 78(b) and L. Civ. R. 78.1(b). For the reasons that follow, Defendant's motion to compel is **GRANTED**.

---

[1] In this Opinion, Defendant's motion to compel (D.E. 117) will be referred to as "Def. MTC." Plaintiffs' brief in opposition (D.E. 124) will be referred to as "Pl. Opp." Defendant's reply brief (D.E. 127) will be referred to as "Def. Rep."

## I. FACTS AND PROCEDURAL HISTORY

### A. Factual Background

Defendant TCP is a Delaware corporation and "a public company with more than 959 specialty retail stores nationwide, selling children's clothing and related goods and services." Complaint ("Compl.") ¶ 14; D.E. 1. Plaintiff Angela Essex is a former TCP Store Manager, who worked for TCP from approximately May 12, 2012 until April 18, 2015. *Id.* ¶ 11. Plaintiff Gabriela Maradiaga is also a former TCP Store Manager, who TCP employed from approximately February 2011 until May 2014. *Id.* ¶ 12. Plaintiffs represent a class of 377 current and former TCP Store Managers. Def. MTC.; D.E. 117.

In October 2014, TCP developed an arbitration program. The program applied to all TCP Associates ("Associates"), which includes Store Managers, working at retail stores in the United States. Declaration of Jennie Commoreto in Support of Defendant's Motion to Compel Arbitration ("Commoreto Decl.") ¶ 2; D.E. 117-2. TCP uses an intranet portal ("Portal") to communicate with Associates. To gain access, Associates use an employee identification number and personal password. *Id.* Since October 2014, the Portal has included The Mutual Agreement to Arbitrate Claims ("the Arbitration Agreement"). *Id.* ¶ 4.

When TCP introduced its arbitration program, Associates already working for TCP received a message through the Portal, directing them to review the Arbitration Agreement. *Id.* ¶ 3. The message explained that TCP was implementing an arbitration program. It, further, stated that "[i]t is important that you review the Arbitration Agreement carefully" and that "[w]e expect all Associates to review and sign the Arbitration Agreement. However, because *it is not a mandatory condition of your employment, you may elect to opt out and not be subject to* the Arbitration Agreement." Commoreto Decl. Exhb. 1 (TCP Arbitration Agreement

2

Announcement); D.E. 117-3 (emphasis added). Associates hired after October 2014 reviewed the Arbitration Agreement following orientation. *Id.* ¶ 4.

The Arbitration Agreement's introductory paragraph states:

> The Children's Place and Associate recognize that differences may arise during or following the Associate's application, assignment, employment, including any and all periods of employment with The Children's Place. By entering into this Agreement, The Children's Place and Associate anticipate gaining the benefits of an impartial final and binding dispute-resolution procedure.

Commoreto Decl. Exhb. 2 at 1.

The Arbitration Agreement further states in in relevant part:

> 1. *Arbitration.* Arbitration under this Agreement is governed by the Federal Arbitration Act (9 U.S.C. § 1 et seq.). Subject to Section 2 below, this Agreement applies to any dispute arising out of or related to Associate's application for employment, employment or separation of employment with The Children's Place regardless of its date of accrual and survives after the employment relationship terminates.
>
> *Except as otherwise stated in Section 6 below, The Children's Place and Associate agree that any dispute or controversy covered by this Agreement, or arising out of, relating to, or concerning the validity, enforceability or breach of this Agreement, shall be resolved by binding arbitration and not by court or jury trial. Except as otherwise stated in this Agreement, The Children's Place and Associate understand and agree that they are waiving their right to maintain a court action or jury trial to resolve the covered dispute.*
>
> 2. *Claims Covered by this Agreement.* Except as otherwise provided, this Agreement also applies, without limitation, to disputes arising out of or related to the employment relationship or termination of that relationship . . . compensation, classification, minimum wage, seating, expense reimbursement, overtime, breaks, meal and rest periods, termination, discrimination or harassment and claims arising under . . . Fair Labor Standards Act . . . state or local statutes or regulations addressing the same or similar matters, and all other

3

federal, state or local legal claims arising out of or relating to Associate's employment or termination . . . .

*Id.* at 1-2 (emphasis in original).

Importantly, the Arbitration Agreement also includes a class, collective, and representation waiver:

> 6. *Class, Collective, and Representation Waiver.* THIS AGREEMENT AFFECTS ASSOCIATE'S ABILITY TO PARTICIPATE IN CLASS, COLLECTIVE OR REPRESENTATIVE ACTIONS. BOTH THE CHILDREN'S PLACE AND ASSOCIATE AGREE TO BRING ANY DISPUTE COVERED BY THIS AGREEMENT IN ARBITRATION ON AN INDIVIDUAL BASIS ONLY, AND NOT AS A CLASS, COLLECTIVE OR PRIVATE ATTORNEY GENERAL OR OTHER REPRESENTATIVE ACTION. THEREFORE, BY ENTERING INTO THIS AGREEMENT, THERE IS NO RIGHT OR AUTHORITY FOR ANY DISPUTE COVERED BY THIS AGREEMENT TO BE BROUGHT, HEARD OR ARBITRATED AS A CLASS, COLLECTIVE, OR PRIVATE ATTORNEY GENERAL OR OTHER REPRESENTATIVE ACTION, OR AS A MEMBER IN ANY SUCH CLASS, COLLECTIVE, OR PRIVATE ATTORNEY GENERAL OR OTHER REPRESENTATIVE PROCEEDING ("Class Action Waiver").
>
> Notwithstanding any other provision of this Agreement or the AAA Rules, disputes regarding the validity, enforceability or breach of the Class Action Waiver may be resolved only by a civil court of competent jurisdiction and not by an arbitrator.
>
> . . .
>
> The Children's Place will not retaliate against, discipline or threaten to discipline Associate as a result of Associate exercising Associate's rights under Section 7 of the National Labor Relations Act by the filing of or participation in a class, collective, or private attorney general or other representative action in any forum. However, The Children's Place may lawfully seek enforcement of this Agreement and the Class Action Waiver under the Federal Arbitration Act and seek dismissal of such class, collective, or private attorney general or other representative actions or claims.

*Id.* at 3 (emphasis in original).

Finally, the Arbitration Agreement contains an opt out provision:

> 8. *Opt Out Right.* Arbitration is not a mandatory condition of Associate's employment at The Children's Place, and therefore Associate may submit a statement notifying The Children's Place that Associate wishes to opt out and not be subject to this Agreement. If Associate elects to opt out Associate must notify The Children's Place of Associate's intention to opt out by submitting a signed and dated statement on a "Mutual Agreement to Arbitrate Opt Out Form" that can be accessed on the Portal at People/My Place/ Supplemental. In order to be effective, Associate's opt out notice must be provided within 30 days of Associate's receipt of this Agreement. If Associate timely opt outs as provided in this paragraph Associate will not be subject to any adverse employment action as a consequence of that decision, and Associate may pursue available legal remedies without regard to this Agreement. If Associate does not opt out of this Agreement within 30 days of Associate's receipt of this Agreement, continuing employment constitutes mutual acceptance of the terms of this Agreement by The Children's Place and Associate, and The Children's Place and Associate will be bound by the terms of this Agreement.
>
> THIS AGREEMENT IS A CONTRACT AND COVERS IMPORTANT ISSUES RELATING TO ASSOCIATE'S RIGHTS. IT IS ASSOCIATE'S SOLE RESPONSIBILITY TO READ IT AND UNDERSTAND IT. ASSOCIATE HAS THE RIGHT TO CONSULT WITH COUNSEL OR INDEPENDENT ADVISORS OF ASSOCIATE'S CHOICE OUTSIDE THE COMPANY CONCERNING THIS AGREEMENT.

*Id.* at 4. (emphasis in original).

The Arbitration Agreement is signed electronically by an Associate. *Id.* ¶ 5. The Associate is instructed to "Click to Sign" on the electronic form, which evidences his or her electronic signature. *Id.* The Associate also needs to enter the last four digits of his or her social security number to confirm his or her identity. *Id.* Clicking the accept button prompts the Associate to receive a message that confirms the validity of his or her signature. *Id.* The Associate then clicks a submit button to complete the process.

An Associate who declines to accept the terms of the Arbitration Agreement, fills out and submits the Mutual Agreement – Opt Out Form ("Opt Out Form"), which is also located on the TCP Portal. *Id.* ¶ 6. The Opt Out Form provides:

> I have received and read the Mutual Agreement to Arbitrate Claims ("Agreement") and have elected to opt out of the Agreement. I understand that there will be no adverse employment action taken against me as a consequence of that decision. I understand that the Agreement will not apply to me.

Commoreto Decl. Exhb. 4 (Opt Out Form); D.E. 117-3.[2]

TCP alleges, and Plaintiffs do not dispute, that of the 377 TCP Store Managers who have filed consent to join this lawsuit, 209 of them signed and submitted the Arbitration Agreements. Commoreto Decl. ¶ 11. Additionally, one Store Manager, Edward Matthews, who filed consent to join the lawsuit, was deemed to have accepted the Arbitration Agreement by never returning an Opt Out form and continuing his employment with TCP "after being advised in writing that continued employment would constitute acceptance of the Arbitration Agreement's terms." *Id.* ¶ 12. On the other hand, TCP admits that Plaintiff Angela Essex and forty-eight other TCP Store Managers who have filed consent to join the lawsuit signed and submitted Opt Out Forms. *Id.* ¶ 7.

---

[2] A TCP Associate has thirty days after receiving the Arbitration Agreement to sign and submit it or sign and submit an Opt Out Form. If an Associate does neither, TCP's Human Resource Department sends a letter to the Associate's home address. The letter advises the Associate of the options described on the TCP Portal and encloses a copy of the Arbitration Agreement. The letter, further, advises the Associate that he or she has an additional thirty days to sign and submit either the Arbitration Agreement or Opt Out Form. However, if at end of the additional time period, the Associate still has not taken action, TCP deems that the Associate to have agreed to the Arbitration Agreement. Commoreto Decl. ¶¶ 9-10.

6

### B. Procedural Background

On July 17, 2015 Plaintiffs filed a Complaint alleging that "they are entitled to, *inter alia*: (i) unpaid overtime wages for hours worked above 40 in a workweek, as required by law, and (ii) liquidated damages pursuant to the FLSA, 29 U.S.C. §§ 201, et seq." Compl. ¶ 1. On March 4, 2016, the case was reassigned from Judge Cecchi to the undersigned. D.E. 53.

On August 16, 2016, the Court conditionally certified a class of TCP Store Managers and ordered that by September 16, 2016, the parties had to submit the proposed notice and consent forms to the Court for review and approval. D.E. 73, 74. After reviewing Defendant's objections to the proposed notice and consent forms, the Court, on September 29, 2016, ordered that notice had to be sent to all TCP Store Managers within three years of August 16, 2016, regardless of whether a Store Manager signed an arbitration agreement. D.E. 78. The Order indicated that while the Court was not addressing any potential arbitration agreement at the conditional certification stage, the Court would address the applicability of any such agreement "at a later date, if necessary[.]" *Id.* at 2.

As noted, following notice to potential plaintiffs, Defendant now moves to compel arbitration as to certain Opt-In Plaintiffs, which Plaintiffs oppose. Plaintiffs later submitted a letter asking the Court to consider the case of *NLRB v. Alternative Entertainment, Inc.*, No. 16-1385 (6th Cir. May 26, 2017). D.E. 128. Defendant responded with a letter refuting Plaintiffs' interpretation of *Alternative Entertainment, Inc.* D.E. 129.

## II. LEGAL STANDARD

Originally passed in 1925, the Federal Arbitration Act ("FAA") "makes agreements to arbitrate enforceable to the same extent as other contracts." *Harris v. Green Tree Fin. Corp.*, 183 F.3d 173, 178 (3d Cir. 1999) (citing *Seus v. Nuveen & Co.*, 146 F.3d 175, 178 (3d Cir.

7

1998)). As a consequence, "federal law presumptively favors the enforcement of arbitration agreements." *Harris*, 183 F.3d at 178 (citing *In re Prudential Ins. Co. of Am. Sales Practice Litig.*, 133 F.3d 225, 231 (3d Cir. 1998)). To that end, "as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Singh v. Uber Techs. Inc.*, 235 F. Supp. 3d 656, 664 (D.N.J. 2017) (internal quotations and citations omitted).

Notwithstanding the presumption of favoring arbitration agreements, a district court "must affirmatively answer the following two questions before compelling arbitration pursuant to § 4 of the FAA: (1) whether the parties entered into a valid arbitration agreement; and (2) whether the dispute at issue falls within the scope of the arbitration agreement." *Singh*, 235 F. Supp. 3d at 523 (citing *Century Indem. Co. v. Certain Underwriters at Lloyd's*, 584 F.3d 513, 523 (3d Cir. 2009)). To determine the validity of an arbitration agreement, courts apply "ordinary state-law principles that govern the formation of contracts." *Kirleis v. Dickie, McCamey & Chilcote, P.C.*, 560 F.3d 156, 160 (3d Cir. 2009) (quoting *First Options of Chic., Inc. v. Kaplan*, 514 U.S. 938, 944 (1995)). New Jersey courts apply basic contract principles when determining whether a valid arbitration agreement exists. *Martindale v. Sandvik, Inc.*, 173 N.J. 76, 87 (2002).[3] To be enforceable, a "waiver-of-rights provision must reflect that an employee has agreed clearly and unambiguously to arbitrate the disputed claim. Generally, [New

---

[3] Defendant applies New Jersey law to its arguments concerning contract interpretation. Plaintiff does not dispute the suitability of New Jersey law. Thus, the Court will apply New Jersey law. *See Manley Toys, Ltd. v. Toys R Us, Inc.*, 2013 WL 244737, at *2 (D.N.J. Jan. 22, 2013) ("Because the parties have argued the viability of the remaining claims as though New Jersey substantive law applies, the Court will assume that to be the case.") (citing *USA Mach. Corp. v. CSC, Ltd.*, 184 F.3d 257, 263 (3d Cir. 1999) ("[D]espite the interstate, and indeed international, nature of the putative transactions at issue, the parties have not chosen to address choice-of-law issues. . . . Because the parties appear to be in agreement on this issue, we will assume, without deciding, that Pennsylvania law supplies the appropriate substantive rules.)).

Jersey courts] determine a written agreement's validity by considering the intentions of the parties as reflected in the four corners of the written instrument." *Leodori v. CIGNA Corp.*, 175 N.J. 293, 302 (2003). "In determining whether the particular dispute falls within a valid arbitration agreement's scope, 'there is a presumption of arbitrability[:] an order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute.'" *Century Indem. Co.*, 584 F.3d at 524 (quoting *AT & T Techs. v. Communs. Workers of Am.*, 475 U.S. 643, 650 (1986) (internal quotation marks and citations omitted)).

### III.   LEGAL ANALYSIS

As a threshold matter, Defendant contends that Opt-In Plaintiffs who signed the Arbitration Agreement entered into valid arbitration agreements and that those agreements cover the wage-and-hour claims at issue here. Def. MTC. at 12-16. Plaintiffs do not contest Defendant's analysis and apparently concede the point. The Court agrees with Defendant's analysis and finds that the parties entered into a valid arbitration agreement and that the dispute at issue falls within the scope of the arbitration agreement. The Arbitration Agreement clearly indicates that it "applies to *any dispute arising out of or related to Associate's* application for employment, *employment* or separation of employment with The Children's Place *regardless of its date of accrual* and survives after the employment relationship terminates." Commoreto Decl. Exhb. 2 at 1 (emphases added). The current suit falls within the scope of this language: it concerns appropriate pay during the time that the relevant Opt-In Plaintiffs were employed by Defendant.

Instead of contesting the two requisite elements, Plaintiffs assert that they have a right to engage in concerted legal action and that the "Class, Collective and Representation Action Waiver" ("the Waiver") in the Arbitration Agreement violates that right. Pl. Opp. 12-14.

Plaintiffs, further, argue that the "Opt Out Right" in the Arbitration Agreement does not make the Arbitration Agreement legal. *Id.* at 14-17. To support their position, Plaintiffs rely on several recent circuit decisions, including: *Morris v. Ernst & Young, LLP*, 834 F.3d 975, 979 (9th Cir. 2016), *cert. granted,* 137 S. Ct. 809 (2017); *Lewis v. Epic Sys. Corp.,* 823 F.3d 1147, 1151 (7th Cir. 2016), *cert. granted,* 137 S. Ct. 809 (2017); and *Nat'l Labor Relations Bd. v. Alternative Entm't, Inc.,* 858 F.3d 393, 396 (6th Cir. 2017). The Third Circuit has not addressed the issue.

The Court does not find these cases apposite.[4] In all three cases, employees had to sign an arbitration agreement with a provisions permitting only individual arbitration as a *mandatory* condition of employment. For example, in *Morris*, an accounting firm "required" employees to sign agreements not to join with other employees as "a condition of employment." 834 F.3d. at 979. Similarly, in *Lewis*, a healthcare software company sent some employees "an arbitration agreement *mandating* that wage-and-hour claims could be brought only through individual arbitration" and "gave employees *no option* to decline [to sign] if they wanted to keep their jobs." 823 F.3d at 1151 (emphases added). And in *Alternative Entertainment, Inc.*, the administrative law judge found that the company "compel[ed] employees, as a condition of employment, to sign arbitration agreements waiving their right to pursue class or collective actions in all forums, arbitral and judicial." 858 F.3d at 399-400.

In contrast, the relevant Opt-In Plaintiffs were not required to participate in TCP's arbitration program as a condition of employment with TCP. TCP's "Arbitration Agreement

---

[4] The Court is not indicating that it would (or, for that matter, would not) follow those decisions even if the Arbitration Agreement here was mandatory rather than optional. As noted, the Third Circuit has not addressed the issue, and at least one court in this District has disagreed with the reasoning from other Circuits. *See Kobren v. A-1 Limousine Inc.*, 2016 WL 6594075 (D.N.J. Nov. 7, 2016). Because the Arbitration Agreement was optional, the Court does not reach the issue.

10

Announcement" and the Arbitration Agreement expressly state that signing the Arbitration Agreement is not a mandatory condition of employment. *See* Commoreto Decl. Exhb. 1; Commoreto Decl. Exhb. 2 at 4. To the contrary, the Arbitration Agreement has a clear "opt out" provision. Indeed, the named Plaintiffs and numerous other Plaintiffs who have opted into this case first opted out of the Arbitration Agreement. Thus, this case is like *Singh*, where the court found that it did not need to reach the circuit split discussed in *Morris* and *Lewis*, because the arbitration agreement at issue was optional. 235 F. Supp. 3d at 673-74 (holding that unlike in the circuit split cases, the arbitration agreement had an opt-out clause and that "[s]uch a provision can hardly be construed to interfere with, restrain, or coerce an employee into forfeiting the rights afforded by § 7 of the NLRA").[5] As noted, here, forty-nine Plaintiffs did opt out of the Arbitration Agreement, Commoreto Decl. ¶ 7, and Defendant admits that they are, therefore, not subject to this motion to compel. Def. Rep. at 4.

In sum, the Court finds that Plaintiffs who signed the TCP Arbitration Agreement entered into a valid and enforceable arbitration agreement and that this wage-and-hour dispute falls within the scope of the Arbitration Agreement. Thus, the relevant Opt-In Plaintiffs must, as a consequence, arbitrate their claims. Plaintiffs who opted out of the Arbitration Agreement are not bound by it.

---

[5] Indeed, in *Morris* the Ninth Circuit noted that "[i]n contrast [to the case at bar], there was no § 8 violation in *Johnmohammadi v. Bloomingdale's, Inc.* because the employee there could have opted out of the individual dispute resolution agreement and chose not to. 755 F.3d 1072, 1076 (9th Cir. 2014)." 834 F.3d at 983 n. 4.

11

## V. CONCLUSION

Therefore, for the reasons discussed above, the Court **GRANTS** Defendant's motion to compel arbitration as to the relevant Opt-In Plaintiffs. An appropriate Order accompanies this Opinion.

Dated: December 4, 2017

_____
John Michael Vazquez, U.S.D.J.